IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

OPHELIA PARKER, and JOSEPH NASO,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.                                                    Case No. 6:16-cv-01193-CEM-DAB

UNIVERSAL PICTURES, a division of
UNIVERSAL CITY STUDIOS, LLC;
LEGEND PICTURES, LLC; LEGENDARY
PICTURES FUNDING, LLC; LEGENDARY
ANALYTICS, LLC; and HANDSTACK,
P.B.C.,

Defendants.

_____/

**<u>PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND SUPPORTING MEMORANDUM</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ i

I. INTRODUCTION ............................................................................................................. 1

II. NATURE OF THE LITIGATION ..................................................................................... 2

III. SUMMARY OF THE PRELIMINARILY APPROVED SETTLEMENT ............................ 5

IV. THE SETTLEMENT SHOULD RECEIVE FINAL APPROVAL BECAUSE IT IS FAIR,
ADEQUATE, AND REASONABLE ................................................................................ 13

V. THE NOTICE PLAN SATISFIED RULE 23 AND DUE PROCESS .................................. 22

VI. CONCLUSION ................................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) ............................................................ 4, 5, 14, 19

*Access Now, Inc. v. Claire's Stores, Inc.,* No. 00-14017-CIV-MOORE, 2002 U.S. Dist. LEXIS 28975 (S.D. Fla. 2002) ...................................................................................... 13

*Adams v. AllianceOne Receivables Mgmt., Inc.,* No. 3:08-cv-00248-JAH-WVG, Dkt. No. 137 (S.D. Cal. 2012) ........................................................................................ 18

*Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ,................................. 17

*Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) ..................................... 20

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) .................................... passim

*Carpenters Health & Welfare Fund v. Coca-Cola Co*., No. 1:00-CV-2838-WBH, 2008 U.S. Dist. LEXIS 121093 (N.D. Ga. 2008) ...................................................................... 16, 21

*Couser v. Comenity Bank,* 125 F. Supp. 3d 1034 (S.D. Cal. 2015) .......................................... 17

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ........................................................ 13

*Garret v. Sharps Compliance, Inc*., No. 1:10-cv-04030, Dkt. No. 65 (N.D. Ill. 2012) .............. 18

*Gehrich v. Chase Bank USA, N.A*., 316 F.R.D. 215 (N.D. Ill. 2016) ......................................... 17

*Glasser v. Hilton Grand Vacations Co*., LLC, 341 F. Supp. 3d 1305 (M.D. Fla. 2018) ..............15

*Grant v. Ocwen Loan Servicing, LLC*, No. 3:15-cv-01376-J-34, 2019, U.S. Dist. LEXIS 14673 (M.D. Fla. 2019) ........................................................................................ 14

*Haight v. Bluestem Brands, Inc.,* No. 613CV1400ORL28KRS, 2015 WL 12830482, (M.D. Fla. 2015) ............................................................................................... 15

*Hashw v. Dep't Stores Nat'l Bank*, 2016 U.S. Dist. LEXIS 61004 (D. Minn. 2016)................... 18

*In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015)............... 18

*In re Domestic Air Transp. Antitrust Litig* ................................................................. 14

*In re Smith*, 926 F.2d 1027 (11th Cir. 1991)................................................................. 13

*Ingram v. Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001)..................................................... 16, 22

*Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996).......................................................... 17

*Manouchehri v. Styles for Less, Inc.*, 2016 U.S. Dist. LEXIS 80038 (S.D. Cal. 2016) ............... 18

*Morgan v. Pub. Storage,* 301 F. Supp. 3d 1237 (S.D. Fla. 2016) ....................................................23

*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306 (1950) ....................................... 11, 22

*Ressler v. Jacobson*, 822 F. Supp. 1551 (M.D. Fla. 1992) ............................................................ 14

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,* 863 F.3d 460 (6th Cir. 2017). 15

*Spillman v. RPM Pizza,* LLC, 2013 U.S. Dist. LEXIS 72947 (M.D. La. May 23, 2013) ........... 18

*Stein v. Monterey Fin. Servs., Inc.,* No. 2:13-CV-01336, 2017 WL 412874 (N.D. Ala. 2017) .. 15

*Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55 (S.D.N.Y. 2003) .................................. 16

*United States v. Derenak,* 27 F. Supp. 2d 1300 (M.D. Fla. 1998) ............................................... 23

*Weigner v. New York*, 852 F.2d 646 (2d Cir. 1988) ..................................................................... 23

*Wright v. Nationstar Mortg. LLC*, 2016 U.S. Dist. LEXIS 115729 (N.D. Ill. 2016) ................. 18

## STATUTES, RULES, REGULATIONS, AND SECONDARY SOURCES

47 C.F.R. §64.1200............................................................................................................................... 3

Fed. R. Civ. P. 23 ..................................................................................................... passim

Manual for Complex Litigation, Fourth, § 21.312 ................................................................ 11, 22

Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ............................................ passim

Plaintiffs Ophelia Parker and Joseph Naso ("Plaintiffs") respectfully request that the Court grant final approval of the class action settlement in all material respects, find that the notice plan comported with due process, certify the settlement class, and order that the remainder of the Settlement be implemented in accordance with its terms. Ex. A (Joint Stipulation of Settlement and Release). The Parties and Settlement Administrator JND Legal Administration Co. ("JND") have complied with the terms of the Stipulated Settlement and the Order granting preliminary approval, and no objections have been filed. *See* Doc. 169; Ex. B (Second Declaration of Edmund Normand) at ¶ 11; and Ex. C (Declaration of Jennifer Keough with JND) at ¶ 19 (noting no objections). This motion is unopposed by Defendants.

## I.   INTRODUCTION

This class action settlement resolves claims alleging that the Defendants, without consent, sent hundreds of thousands of spam text messages to consumers' cellphones — despite the fact that many had registered on the National-Do-Not-Call list and without regard to the time of day or requests for opt-outing out of such messages — using an automatic telephone dialing system in violation of the Telephone Consumer Protection Act ("TCPA"). After years of hard-fought litigation taking place throughout the country, and multiple starts and stops at mediation, the instant settlement was achieved. This result provides outstanding relief to the Class pairing monetary relief that eclipses comparable TCPA settlements with injunctive relief that ensures that all consumers, not just those in the instant case, are protected from such behavior in the future.

On April 4, 2018, the Court granted preliminary approval to the Settlement and directed the Parties' to implement the Notice Plan. Doc. 169. The Notice Plan approved by the Court, and since effectuated, resulted in direct notice being provided to over 460,000 class members via electronic mail and/or mail notice, which was further supported by Internet publication on a dedicated Settlement website. Ex. C at ¶ 12. The deadline for the submission of objections has now passed and not a single objection has been submitted. Ex. C at ¶¶ 18-19. Given the strength

of the Settlement--creating a fund of up to $19,225,515.00 by which Class members can claim between $35.00 and $185.00 (Ex. A at ¶ 12) each and requiring injunctive relief that prevents the complained-of behavior from ever occurring again--the lack of opposition to the Settlement is not surprising. Ex. C at ¶¶ 17 and 19.

The complexities, risks, and favorable results in this hard-fought litigation make the Settlement more than "fair, reasonable, and adequate" and fully warrant granting final approval. In particular, there were radical changes in the law in the midsts of litigation, due mostly to a landmark FCC ruling, discussed below. Counsel for Defendants, two of whom are multi-billion dollar entertainment companies represented by two large and powerful law firms, vigorously defended the claims in the action. Accordingly, motions practice and discovery were extensive and laborious. The similarly intense settlement negotiations were protracted, and settlement was reached at arms-length over multiple mediations spanning months of negotiations, under the supervision of two nationally-respected mediators. Based on these factors and as discussed in detail below, Plaintiffs Ophelia Parker and Joseph Naso now move the Court to grant final approval of the proposed Settlement.

## II.  NATURE OF THE LITIGATION

### A.  Nature Of The Claims

This case asserts that the Defendants' telemarketing solicitation practices violated multiple sections of the TCPA, 47 U.S.C. §227(b) and (c). *See* Doc. 97 (Third Amended Complaint). The TCPA prohibits, *inter alia*, calling a cell phone using an automatic telephone dialing system ("ATDS") or an artificial or prerecorded voice, or initiating any telephone solicitation to a telephone subscriber who has registered his or her telephone number on the National Do-Not-Call Registry. *See* 47 U.S.C. 227(b)-(c). The TCPA's accompanying regulations provide further restrictions, such as limiting the time of day telemarketers can make calls or send text messages

and requiring companies who initiate telemarketing to have internal procedures regarding opt-outs. *See* 47 C.F.R. §64.1200. A private right of action exists for such violations under 47 U.S.C. § 227(b)(3) and (c)(5).

Legendary and Universal jointly produced and marketed *Warcraft*, a major motion picture released in June 2016. Doc. 99 at ¶¶ 40-41. Legendary and Universal contracted with Handstack to effectuate a text-marketing campaign to promote *Warcraft*. *See* Doc. 112 at 3. Over a period shorter than a month, text messages were sent to approximately 466,779 telephone numbers. *See* Doc. 163-5*,* Ex. E (Anya Vekhvoskaya's Supplemental Report). Plaintiffs alleged the following: Defendants did not verify if the telephone numbers receiving the text messages were on the National Do-Not-Call Registry (Doc. 97 at ¶ 92); many recipients replied requesting that Defendants cease sending them text messages, but were ignored (Doc. 97 at ¶ 202); and many recipients received text messages before 8:00 A.M. or after 9:00 P.M. local time (Doc. 97 at ¶ 191), all in violation of 47 U.S.C. §227(c) along with associated regulations located in 47 C.F.R. §64.1200. Plaintiffs also alleged that Defendants transmitted the text messages via an ATDS, in violation of 47 U.S.C. §227(b). Doc. 97 at ¶¶ 105-106.

### B.  The Parties Engaged In Extensive Discovery And Motions Practice

From the initial filing and service of the original complaint over three years ago, both sides vigorously litigated this case. Ex. B at ¶¶ 16-38. The litigation was contentious and motion-heavy from the outset. The Parties filed briefing on Defendant Universal's initial motion to transfer venue. Ex. B at ¶ 17. The Parties were also required to address early-on Defendant Handstack's default, which involved briefing, extensive communications and travel between the Parties, and a hearing before Magistrate Judge Irick. Ex. B at ¶¶ 18-26. In addition, there were multiple pleading amendments as discovery revealed additional defendants and causes of action; the operative

complaint at the time of settlement was the Third Amended Complaint. Doc. 97. Finally, following massive discovery efforts, the Parties fully briefed the issue of class certification, and the case settled on the eve of the summary judgment deadline. Ex. B at ¶¶ 28-29, and 47; and Ex. D at ¶ 19. (Declaration of Rodney Max).

The Parties also engaged in large-scale discovery related to the merits of the various causes of action and the issue of class certification. Ex. B at ¶¶ 30-36. Plaintiffs sent Defendants eleven separate sets of Requests for Production, four separate sets of Interrogatories, and six separate sets of Requests for Admission. Ex. B at ¶ 31. Defendants produced hundreds of thousands of pages and tens of thousands of documents. Ex. B at ¶¶ 31-36. Defendants also served, and Plaintiffs' responded to, multiple Requests for Production and Interrogatories. Ex. B at ¶ 31. Plaintiffs engaged multiple experts, both consulting and testifying, to opine on the technical matters at issue in the case, in particular related to Defendant Handstack's text messaging system, and the data related to the text messages themselves. Ex. B at ¶¶ 13, 33-36.

The Parties conducted thirteen depositions, most lasting an entire day each, in Massachusetts, California, Florida, and Virginia, requiring significant travel and time to complete. *See* Doc. 171, Ex. F (Deposition Notices); Ex. B at ¶ 32. Some of the depositions involved detailed investigation of the technical aspects of Handstack's text messaging system, including the data it compiled. Ex. B at ¶¶ 32-36 Other depositions involved understanding Defendant Legendary and Universal's complex corporate structures, management oversight, the usage of analytic and personal information, and the relationships between the Parties.

## C.  The Uncertain Legal Landscape

The Parties have litigated this case in the face of uncertain, complex legal questions and recent changes to the TCPA landscape. The changes to the law included the landmark case of *ACA*

*Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), where the D.C. Circuit invalidated aspects of the FCC

2015 Declaratory Ruling, including, *inter alia*, the extent to which the 2015 Ruling interpreted the

critical definition of an ATDS. *Id.* at 691. The D.C. Circuit also overruled FCC Orders to the extent

that they seemingly held both that (i) a device qualifies as an ATDS only if it has the capacity to

generate random or sequential numbers to be called and (ii) that a device qualifies as an ATDS

even without such capacity, so long as it is capable of automatically dialing numbers from a pre-

programmed database of numbers. *Id.* at 703. Whether or not Defendants utilized an ATDS in

transmitting the text messages was a dispositive factor for Plaintiffs' and the classes' ATDS

claims, the largest class claim in Plaintiffs' complaint; therefore, the decision in *ACA Int'l v. FCC*

introduced significant uncertainty over a year into the litigation and made achieving settlement

more difficult.

Other issues, including Defendant Handstack's insolvency status, created uncertainty for

collecting damages. Ex. B at ¶¶ 37-38. Factual issues were in dispute concerning whether

Handstack was Defendant Universal's and Legendary's actual or apparent agent, or whether

Universal and/or Legendary were otherwise liable for Defendant Handstack's transmission of the

text messages. Ex. B at ¶¶ 37-39. Legendary and Universal argued that they did not initiate the

text messages, and disputed that they were liable under agency principles for Handstack's actions.

*See* Doc. 103 (Universal 8th affirmative defense) and Doc. 102 (Legendary 8th affirmative

defense). Without agency or direct liability, Universal and Legendary, the only financially viable

Defendants, could not be liable for the text message campaign. Ex. B at ¶¶ 37-38.

### D.  The Settlement Negotiations Were Lengthy And Contentious

The Settlement was the product of lengthy negotiations supervised by two experienced

mediators, Jay Cohen and Rodney Max. *See* Ex. B at ¶¶ 40-41. Mr. Cohen and Mr. Max are well-

known nationally and internationally as highly-skilled mediators with experience in complex cases and class actions. *See* Ex. B at ¶¶ 40, 46, and Doc. 163. Settlement negotiations included three mediation sessions, as well as dozens of telephone conferences and emails between counsel for the Parties. Ex. B at ¶¶ 39-49.

The first in-person mediation was held on April 26, 2018, before Mr. Cohen. *See* Ex. B at ¶ 40. Even though settlement discussions occurred prior to and following the first mediation, the Parties came to an impasse after the first formal session. *See* Doc 141. After six additional months of litigation, the Parties resumed settlement discussions. Ex. B at ¶¶ 39-40. Mediation sessions with Mr. Max were held on October 16, 2018, in Orlando, Florida, and on a Sunday, on October 28, 2018, in Chicago, Illinois. Ex. B at ¶ 41. The Parties also participated in pre-mediation telephone calls with Mr. Max, and Mr. Max continued communications with the Parties after mediation. Ex. B at ¶ 42. It was not until the second and third mediations held before Mr. Max that the Parties made meaningful progress towards resolution. *See* Ex. D (Declaration of Rodney Max). The length of the negotiations was not due to a lack of effort or commitment by the Parties, but rather was impacted by the hard-fought litigation and the uncertainty over the likelihood of success of the various claims. Ex. B at ¶ 46.

During the third mediation session, Mr. Max successfully assisted the Parties in structuring the terms of the Settlement to enable Plaintiffs and Defendants Universal and Legendary to reach general outlines of an agreement. Ex. B at ¶ 41. Still, it took two more weeks before the Parties finalized the terms of the Settlement. *See* Ex. B at ¶¶ 41 and 49. Settlement between all Parties was finalized on November 16, 2018. *See* Ex. B at ¶ 49. Mr. Max was instrumental in assessing the respective risks of settlement and ensuring that the procedural protections of Rule 23 were satisfied. *See* Ex. D. Importantly, the Parties did not negotiate or even discuss attorneys' fees,

costs, or service awards until all other terms of the Settlement were agreed upon. Ex. B at ¶¶ 43, 46, and 78; and *see* Ex. D at ¶ 20.

## III.    SUMMARY OF THE PRELIMINARILY APPROVED SETTLEMENT

### A.  Class Definitions

The Preliminarily Certified Settlement Classes are defined as follows:

1. The "ATDS Class" consists of all persons or entities within the United States who received one or more text messages as part of the *Warcraft* Text Messaging Campaign.

2. The "Internal-Do-Not-Call Class" consists of all persons within the United States who received more than one text message to a residential line as part of the Warcraft Text Messaging Campaign, one of which was received after the Class Member submitted a request to not receive additional texts.

3. The "National Do-Not-Call Class" consists of all persons within the United States who received more than one text message to a residential line as part of the Warcraft Text Messaging Campaign (a) in a 12-month period; and (b) more than 30 days after the placement of their number on the National Do-Not-Call Registry.

4. The "Out of Time Class" consists of all persons within the United States who received more than one text message to a residential line as part of the Warcraft Text Messaging Campaign, at least one of which was before 8 A.M. or after 9 P.M. local time at the texted person's location.

Doc. 166 and Doc. 169. Excluded from the Settlement Classes are (1) the trial judge presiding over this case; (2) Defendants, as well as any parent, subsidiary, affiliate or control person of Defendants, and the officers, directors, agents, servants or employees of Defendants; (3) any of the Released Parties; (4) the immediate family of any such person(s); (5) any Settlement Class

Member who has timely opted out of the Settlement; and (6) Class Counsel, their employees, and their immediate family. *Id.*

### B. Benefits To The Class

#### 1. Monetary Payments

The Settlement requires Legendary to provide $19,225,515.00 available for settlement of valid claims, settlement administration costs, attorneys' fees, a service award to each Plaintiff, and costs and expenses of the litigation. Doc. 166 at 5.

Each payment is separate and cumulative, so that each Class Member can receive up to a total of $185.00. Ex. A at ¶ 40. Each Settlement Class Member of the "ATDS Class" who submits a timely and valid claim form will receive a check in the amount of $35.00. Ex. A at ¶ 40. Each Settlement Class Member of the "Internal Do-Not-Call Class" who submits a timely and valid claim form will receive a check in the amount of $50.00. Ex. A at ¶ 40. Each Settlement Class Member of the "National Do-Not-Call Class" who submits a timely and valid claim form will receive a check in the amount of $50.00. Ex. A at ¶ 40. Each Settlement Class Member of the "Out of Time Class" who submits a timely and valid claim form will receive a check in the amount of $50.00. Ex. A at ¶ 40.

Class Members are permitted to submit claims up through the Claims Deadline, which is July 10, 2019. Doc. 166 at 25. The amount available to each individual Class Member, if the Settlement is approved, is a minimum of $35 and maximum of $185, depending on the claimant's membership status in each Class. Ex. B at ¶ 62. Though unlikely, the amount of the claims may be reduced pro-rata if the total amount required to pay each claim exceeds the net amount remaining available for such payments from the $19,225,515.00, after payment of: (1) the Settlement Administration Expenses (of which only $750,000.00 may be deducted from the total monetary

settlement, with Legendary remaining liable for any administration costs that so exceed this amount); (2) the Incentive Awards to the Class Representatives; and (3) the Fee Award. In such unlikely situation, each Settlement Class Member with an Approved Claim shall receive a pro-rata reduced amount for such Class Member's Approved Claim, as determined by the remaining net balance. Given that an amount of $19,225,515.00 is available, it is almost certain that sufficient funds will be available to pay every claimant $35.00 and up to $185.00. Ex. B at ¶¶ 53, 63-65.

2. <u>Injunctive Relief</u>

In addition to securing monetary relief, the Settlement Agreement also requires Defendants to take affirmative steps to protect consumers' privacy and ensure compliance with the TCPA going forward. Importantly, these steps result in the cessation of the offending behavior for all Class Members and serve to help prevent future consumers from experiencing such harms. Ex. A at ¶¶ 40-45. Specifically, as consideration for the Release contained in the Settlement, Defendant Handstack has agreed to the following changes in their business practices as injunctive relief:

a. Handstack, for itself or for any client, will not use the Cell Phone Number List used in Warcraft texting campaign("Cell Phone Number List") or any part of it to send or direct any text message and will not provide the Cell phone Number List to any other person or entity;

b. Should Handstack, on behalf of itself or for any client, carry out any telemarketing using its web-based platform for sending to groups and receiving return text messages (the "Handstack Platform") as used for the Warcraft Text Message Campaign, to a cellular telephone service, Handstack shall be subject to the following terms:

1. Handstack shall maintain and create a database of individuals who have provided prior consent as required by the TCPA or the rules and regulations promulgated thereunder, to receive such calls/texts, including the date and manner in which such consent was obtained;

9

2. Handstack shall implement reasonable procedures to ensure that no phone number on the National Do Not Call Registry is called/texted absent prior express consent from the person assigned the number; and

3. Handstack shall develop and implement a written TCPA compliance policy, which includes maintaining an internal opt-out list for any future telemarketing campaigns.

Unless such call/text is made to collect a debt owed to or guaranteed by the United States, made for emergency purposes, made with prior express consent of the called party, or otherwise made in compliance with the TCPA, the rules and regulations promulgated thereunder, and/or applicable case law, or made as an individual acting in the course of a business in which Handstack has no control over or authority to determine TCPA compliance or Handstack does not initiate the sending of text messages.

Ex. A at ¶¶ 41, 45.

Furthermore, as consideration for the Release contained in the Settlement, Legendary and

Universal have agreed to implement the following changes in connection with their actions and

thus have agreed to the following injunctive relief:

a. The Legendary and Universal Defendants will neither send nor direct any other person or entity to send any text messages to promote or advertise the *Warcraft* film;

b. Legendary will not employ the services of Handstack to send text messages to market, promote, publicize, or advertise any of Defendants' products or services.

Ex. A at ¶ 42.

## C.  Notice To The Classes

The Notice Plan approved by the Court was designed to provide the best notice practicable.

Doc. 166 and 169. Call logs identified approximately 466,779 unique cellular telephone numbers,

which were used to identify the Settlement Class Members and provide direct notice. Ex. C at ¶¶

5-7; *see also* Ex. B at ¶ 52. "Rule 23(e)(1)(B) requires the court to direct notice in a reasonable

manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." Manual for Complex Litigation, Fourth, § 21.312. Reasonable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

The Notice Plan consisted of email notice, direct mail notice and Internet notice. Ex. A at ¶ 53. Specifically, the Notice Plan entailed sending Notice to approximately 466,779 individuals by email. Ex. A at ¶ 53(b). To the extent that any email could not be delivered or resulted in a bounceback, the Settlement Administrator, to the extent reasonably possible, mailed a postcard containing notice to the Settlement Class Member. *Id.* at ¶ 53(c). The Notice also includes a Settlement Website maintained by the Settlement Administrator; the Settlement Website contains the Long-Form Notice, the Complaint, the Motion for Fee Award and the Motion for Final Approval, and key dates and deadlines for the claims process. *Id.* at ¶ 53(d). The claims process itself is simple and straightforward: Class Members need only submit a valid claim form, which is available on the Settlement Website, before the claims deadline (July 10, 2019), and they will receive their payment in an amount between $35 and $185, depending on which class they belong to.

The Court-approved Notice Plan, as directed in its Preliminary Approval Order, has been fully implemented. Doc. 169. The Notice Plan, as discussed more fully below, satisfies Federal Rule of Civil Procedure 23.

11

### D.  Release

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released all claims, whether known or unknown (including, but not limited to, unknown claims) that were asserted or could have been asserted in this case by Plaintiff or Settlement Class Members, directly against the Released Parties, including all claims arising out of, or relating to, in whole or in part, the claims or facts and circumstances asserted in this case, including, without limitation, any claims by Plaintiff or Settlement Class Members arising out of, or relating to, Defendants' alleged violations of the TCPA during the class period, including the transmission of text messages regarding *Warcraft* between May 1, 2016 and June 31, 2016. *See* Ex. A at ¶ 70. The release is narrowly limited to only the claims and Defendants in this action. Ex. B at ¶ 53.

### E.  Service Award To Class Representatives

Plaintiffs have filed an Unopposed Motion for Attorneys' Fees, Costs, Expenses and Service Awards, requesting a service award of $5,000.00 each to compensate them for their time, effort, and risk in prosecuting this litigation on behalf of the Class. Doc 171; Ex. B at ¶¶ 74-81. The service award will be in addition to the relief the Plaintiffs will otherwise be entitled to under the terms of the Settlement.

### F.  Reasonable Attorneys' Fees, Expenses And Costs Award

The Settlement provides for the payment of Attorneys' fees and expenses to Class Counsel. Plaintiffs' Unopposed Motion for Attorneys' Fees, Costs, Expenses and Service Awards sought attorneys' fees of 23.41% of the Settlement Fund, or $4,500,693.06, and reimbursement of costs and expenses of $171,967.10, pursuant to paragraph 67 of the Stipulated Settlement. *See* Doc. 171 (Plaintiffs' Unopposed Motion for Attorneys' Fees, Costs, Expenses and Service Awards); Ex. A

at ¶ 67. As discussed in Plaintiffs' Motion, the requested fees, expenses and costs are reasonable as a percentage of the benefits conferred on the Classes, and are well within the range deemed reasonable in courts within this Circuit. Doc. 171. The Parties began negotiating the attorneys' fees, costs and expenses only after reaching an agreement on all other material terms of the Settlement. *See* Ex. B at ¶¶ 46 and 72.

## IV.   THE SETTLEMENT SHOULD RECEIVE FINAL APPROVAL BECAUSE IT IS FAIR, ADEQUATE, AND REASONABLE

Under Rule 23, this Court may approve a class settlement "on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Pursuant to Eleventh Circuit caselaw, courts must consider the following factors in determining whether a settlement is fair, reasonable, and adequate:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)). Here, the *Bennett* factors clearly demonstrate that this Settlement is without doubt fair, adequate, and reasonable.

### A.  The Bennett Factors Support Final Approval

In considering the *Bennett* factors, "a class action should be approved so long as it is fair, adequate, reasonable, and not the product of collusion between the parties...Absent fraud, [the court] should be hesitant to substitute its own judgment. ..." *Access Now, Inc. v. Claire's Stores, Inc.,* No. 00-14017-CIV-MOORE, 2002 U.S. Dist. LEXIS 28975, at *12-13 (S.D. Fla. 2002) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see also In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991) ("A trial judge ought not to try a case during a settlement hearing and

should be hesitant to substitute his or her own judgement [of the negotiated terms]." As is set forth below, each of the *Bennett* factors strongly supports final approval of the Settlement.[1]

1. Likelihood of Success at Trial

The risks facing Plaintiffs with continued litigation and trial weigh in favor of granting final approval. The "likelihood and extent of any recovery from the defendants absent . . . settlement" is an important factor in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992) ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

As mentioned above, the landmark case of *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) cast significant doubt as to whether Plaintiffs (and the largest Class alleged in the Third Amended Complaint, the ATDS Class,) could recover under Sec. 227(b) of the TCPA for Defendants' alleged use of an ATDS. Not only did *ACA Int'l* change the landscape of the definition of an ATDS in ways unfavorable to Plaintiffs (since a ruling that Defendants did not use an ATDS would defeat Plaintiffs' Sec. 227(b) claims) but the multitude of subsequent decisions interpreting it, often with different outcomes, added more uncertainty to the law that would determine liability for the largest Class in this action. Finally, the likely future FCC rulemaking on the definition of an ATDS also

---

[1] Fed. R. Civ. P. 23(e) was amended, effective December 1, 2018, to include specific factors for courts to consider in determining if a settlement is fair, adequate and reasonable. *See* Fed. R. Civ. P. 23(e)(2). The factors used by courts in the Eleventh Circuit already encompass those factors enumerated in Rule 23(e) and those factors are therefore satisfied. *See Grant v. Ocwen Loan Servicing, LLC*, No. 3:15-cv-01376-J-34-PDB, 2019 U.S. Dist. LEXIS 14673, at *18 (M.D. Fla. Jan. 29, 2019) (noting that the Rule 23(e) factors "are analogous to several of the *Bennett* factors" and finding in favor of final approval under both Rule 23(e) and *Bennett* factors).

hung over the litigation, creating more uncertainty over the outcome of a trial. Ex. B at ¶¶ 37-38. *See also Glasser v. Hilton Grand Vacations Co*., LLC, 341 F. Supp. 3d 1305, 1314 (M.D. Fla. 2018) (initiating dialing through a computerized system did not constitute the use of an ATDS in violation of the TCPA).

Also, as described *supra*, each of the solvent Defendants denied responsibility and disputed that there was an agency relationship with Defendant Handstack. This cast doubt as to whether Plaintiffs and the Classes could recover any meaningful monetary relief, since Handstack was deemed to be insolvent. *See* Doc. 166 (J. Irick's R&R) at 18 ("[E]ven if Plaintiffs were to prevail against Handstack, they will likely be unable to recover any statutory damages if they cannot establish that Universal and Legendary are vicariously liable for Handstack's actions. ... Considering the nature and number of disputed issues, the undersigned finds that this factor weighs in favor of finding the settlement to be fair, adequate, and reasonable"). The Classes also risked not receiving any relief since class certification in TCPA cases is never a certainty. *See, e.g., Haight v. Bluestem Brands, Inc.,* No. 613CV1400ORL28KRS, 2015 WL 12830482, at *4-5 (M.D. Fla. 2015) (denying class certification where plaintiff failed to prove that "the identities of the persons 'who received' calls in violation of the TCPA [could] be identified"), report and recommendation adopted 2015 WL 12835994 (M.D. Fla. June 1, 2015); *Stein v. Monterey Fin. Servs., Inc.,* No. 2:13-CV-01336-AKK, 2017 WL 412874, at *3–4 (N.D. Ala. 2017) (denying certification because plaintiff could not identify "individuals to whom [defendant] placed debt-collection calls"); *see also Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,* 863 F.3d 460, 470-72 (6th Cir. 2017) (affirming denial of certification where actual recipients of a fax could not be identified). The Parties had fully briefed the issue, and the Court had yet to rule on the motion.

Even if Plaintiffs and the Classes were to succeed at trial on the merits, the amount of monetary recovery is uncertain (since Sec. 227(c) allows recovery of "up to $500" per violation, but can and has resulted in low awards). 47 U.S.C § 227. Moreover, appeals would be guaranteed and any recovery would be delayed for years or could possibly be reversed. Because the value of the settlement (which includes significant monetary and powerful injunctive relief) is undeniably strong in comparison to the uncertainty of any recovery at trial, let alone one exceeding that achieved here, the first *Bennett* factor weighs in favor of approving the settlement.

2. Range of Possible Recovery and Point on or Below the Range at Which Settlement is Fair, Adequate and Reasonable

The second and third *Bennett* factors—the range of possible recovery and the point on or below the range at which a settlement is fair, adequate and reasonable—also weigh in favor of final approval. Courts often combine the analysis of these factors. *Carpenters Health & Welfare Fund v. Coca-Cola Co*., No. 1:00-CV-2838-WBH, 2008 U.S. Dist. LEXIS 121093, at *35 (N.D. Ga. Oct. 20, 2008). No set formula exists to determine where that point lies, "a just result is often no more than an arbitrary point between competing notions of reasonableness." *Bennett v. Behring Corp.,* 737 F.2d 982, 987 (11th Cir. 1984). Courts are guided by "the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Bennett*, 737 F.2d at 986; *see also Ingram v. Coca-Cola Co*., 200 F.R.D. 685, 689 (N.D. Ga. 2001) (noting that application of the *Bennett* factors "often justifies approving settlements that are substantial compromises of the relief that could be obtained through litigation")

A settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co*., 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see also Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."). "The essential point here is that the court should not reject a settlement solely because it does not provide a complete victory to plaintiffs,

for the essence of settlement is compromise." *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215,

228 (N.D. Ill. 2016) (approving $34 million TCPA settlement for class of more than *32* <u>million</u>

<u>individuals</u>) (*citing Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996)); *see also Behrens v. Wometco*

*Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) ("[T]he

fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean

the settlement is unfair or inadequate."). As one court described:

> Individual class members receive less than the maximum value of
> their TCPA claims, but they receive a payout without having
> suffered anything beyond a few unwanted calls or texts, they
> receive it (reasonably) quickly, and they receive it without the time,
> expense, and uncertainty of litigation. [Defendant], for its part,
> buys peace and mitigates risk.

*Gehrich*, 316 F.R.D. at 228.

Similarly, in this case, Class Members are receiving a significant monetary payment (and

valuable injunctive relief) by simply filling out a claim form, without having to endure litigation,

including delays, costs and uncertainty of prevailing. Specifically, Class Members' payouts are

between $35 and $185, depending on which Class they belong to. Ex. B at ¶ 53. These numbers

exceed the range of settlements deemed fair, reasonable and adequate by many courts in TCPA

class actions. *See* Doc. 166 at 19 ("recovery under the TCPA and the Settlement Agreement and

the possibility that Plaintiffs may recover nothing, the undersigned finds that these factors weigh

in favor of finding the settlement to be fair, adequate, and reasonable) (*citing In re Capital One*

*Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 789 (N.D. Ill. 2015) (finding that $34.60 per

person falls "within the range of recoveries" in a TCPA class action)).

Indeed, courts have found similar TCPA class action settlements that paid far less to meet

the standards for final approval. *See, e.g., Couser v. Comenity Bank,* 125 F. Supp. 3d 1034 (S.D.

Cal. 2015) (settlement amount favored final approval, with approximately $13.75 given per class

17

member); *Manouchehri v. Styles for Less, Inc*., 2016 U.S. Dist. LEXIS 80038, at \*4 (S.D. Cal. June 20, 2016) (preliminarily approving settlement where class members could choose to receive either a $10 cash award or a $15 voucher); *Spillman v. RPM Pizza,* LLC, 2013 U.S. Dist. LEXIS 72947 at \*2, \*9 (M.D. La. May 23, 2013) (final approval for up to $15 for each claimant); *Garret v. Sharps Compliance, Inc*., No. 1:10-cv-04030, Dkt. No. 65 (N.D. Ill. Feb. 23, 2012) (claimants received between $27.42 and $28.51); *Hashw v. Dep't Stores Nat'l Bank*, 2016 U.S. Dist. LEXIS 61004 (D. Minn. 2016) (final approval of settlement where "each claimant will receive approximately $33.20"); *In re Capital One TCPA Litigation*, 12-cv-10064 (MDL No. 2416) (N.D. Ill. Feb. 12, 2015) (granting final approval where each claimant would be awarded $39.66); *Adams v. AllianceOne Receivables Mgmt., Inc.,* No. 3:08-cv-00248-JAH-WVG, Dkt. No. 137 (S.D. Cal. Sept. 28, 2012) (claimants received $40 each); *Wright v. Nationstar Mortg. LLC*, 2016 U.S. Dist. LEXIS 115729, \*28 (N.D. Ill. 2016) (finally approving "$45.00 recovery per claimant"); S*teinfeld v. Discover Fin. Servs.*, 2014 U.S. Dist. LEXIS 44855 at \*4 and \*11-12 (N.D. Cal. Mar. 31, 2014) ($46.98 to each claimant); *see also Kolinek v. Walgreen Co*., Case No.1:13-cv-04806 (N.D. Ill.) (final approval given in a TCPA class action settlement involving a $11 million fund for 9.2 million class members that resulted in payments of $30 per class member).

Moreover, Class Members will substantively benefit from the injunctive relief obtained, which requires Defendants to take affirmative steps to protect consumers' privacy and ensure compliance with the TCPA going forward. *See* Ex. C at ¶¶ 41-45 (Joint Stipulation of Settlement). The Settlement bars the usage of any further text message marketing to the Cell Phone Number List, protecting Class Members from suffering future harms. *Id.* It also requires Defendant Handstack, whose technology was used to send the telemarketing text messages in this case, for all future campaigns, (1) to maintain a list of those who have consented to text message marketing,

18

(2) to refrain from marketing to any individual on the National Do Not Call Registry, and (3) to deploy procedures to ensure that any individual who requests to not receive further text messages is able to opt-out. *Id*. In other words, the injunctive relief not only protect Class Members, but future consumers, from the harms alleged in this action.

The $19,225,515.00 Settlement Fund and injunctive relief provided by the Stipulation represents a fair compromise given the risks and uncertainty regarding Plaintiffs' and the Classes' claims.

3. <u>The Complexity, Expense and Duration of Litigation</u>

This factor without a doubt supports final approval of the Settlement. As described above, this case was legally and factually complex, with multiple entities as Defendants. The legal complexity was due in part to the changes to controlling law with the *ACA Int'l* decision and others that followed, which affected the applicable definition of an ATDS, and therefore created uncertainty as to the strength of the ATDS claims. The case was factually complex as well, because of the complicated relationship between the Defendants Legendary and Universal, on the one hand, and Defendant Handstack, on the other, combined with the insolvent status of Defendant Handstack, the party to actual initiate the text messages at issue. Ex. B at ¶¶ 38.

The Parties were engaged in contentious disputes and briefing from the outset, first with respect to Defendant Universal's motion to transfer venue, then in responding to Defendant Handstack's default, and finally in filing briefs on class certification. Ex. B at ¶ 17. Further, Plaintiffs sought to, and did, amend the complaint three times. Ex. B at ¶¶ 16-26. The discovery efforts on both sides were not only massive and time consuming, but involved technical and statistical analysis that required the retention and assistance of numerous experts in the fields of statistics and telecommunications technology. Ex. B at ¶¶ 33-36. This case involved over 400,000

telephone numbers and over 700,000 text messages; the associated data was copious to say the least and the analysis thereof painstaking.

While engaged in such contentious and complex litigation, the Parties also engaged in in-depth settlement negotiations and mediations. After three formal mediation sessions, dozens of telephone calls and emails, and many draft stipulations, the Parties finally reached the instant Settlement. Ex. B at ¶¶ 39-49.

Indeed, Class Counsel spent a substantial portion of their working hours on this case over the last three years. As described in Plaintiffs' Motion for Attorneys' Fees, the Class Counsel attorneys spent 3,600 hours litigating this case (a number which has gone up with the drafting and filing of this motion). Ex. B at ¶¶ 66-70. Class Counsel also spent $171,967.10 in out-of-pocket costs and expenses. Ex. B at ¶ 71. If litigation had continued, those hours would have continued to increase at an exponential rate as the Parties were preparing to file motions for Summary Judgment and as trial was fast approaching. Ex. B at ¶ 41; *see also* Doc. 166 (J. Irick's R&R) at 19 ("[C]onsidering the numerous claims and disputed issues, there is no doubt that continued litigation would be lengthy, expensive, and complex. Therefore, the undersigned finds that this factor weighs in favor of finding the settlement to be fair, adequate, and reasonable"). This was a case with such significant complexity, expense and time-spent that most small-firm lawyers will encounter such a case only a few times in their career. For these reasons, this factor strongly supports final approval.

4.   The Substance and Amount of Opposition to the Settlement

Remarkably, there was not a single objection filed to the Settlement, and of course this Motion for Final Approval is unopposed by Defendants. Ex. C at ¶ 19. Accordingly, this factor clearly favors final approval. *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) ("Less

than 30 of approximately 1.1 million shareholders objected. … This small proportion of objectors does not favor derailing settlement."; *see also In Re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330, 1336, n. 4 (S.D. Fla. 2011) (noting that the average number of objections per million dollars recovered is 4.7). Moreover, only 9 opt-outs have been filed. Such a small proportion of the total number of Class Members (466,847) is insignificant and further confirms the lack of opposition to the Settlement. *See* Ex. C at ¶ 17.

5.   The Stage of Proceedings at which Settlement was Achieved

This factor also clearly supports final approval, as this Settlement was reached after three years of intense litigation. Ex. B at ¶¶ 16-38. Courts look at this factor "to ensure that plaintiffs have had access to sufficient information to evaluate the case and to determine the adequacy of the settlement." *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-2838-WBH, 2008 U.S. Dist. LEXIS 121093, at *40 (N.D. Ga. Oct. 20, 2008). The settlement in this case was reached after the completion of discovery, including expert disclosures by both sides, and even after class certification had been fully briefed. Ex. B at ¶ 29. Plaintiffs therefore had the information necessary to evaluate the strengths and weaknesses of the case, and ultimately to determine that the settlement was beneficial to the class. *See* Doc. 166 (J. Irick's R&R) at 20 ("[T]he parties had ample time to conduct discovery and judge the strengths and weaknesses of their respective positions. As such, the parties were prepared to make well-informed decisions concerning settlement. Therefore, the undersigned finds that this factor weighs in favor of finding the settlement to be fair, adequate, and reasonable.")

**B. The Settlement Was The Result Of Arm's-Length Negotiation Between The Parties With The Assistance Of An Experienced Mediator**

Again, this Settlement was negotiated with the assistance of two experienced mediators, Mr. Cohen and Mr. Max, who are well-respected mediators with extensive experience mediating

21

large consumer class actions. Mr. Cohen and Mx. Max ensured at all times that the negotiations remained professional and at arm's-length. Ex. B at ¶ 46. Importantly, the Parties did not discuss or negotiate attorneys' fees, costs, expenses, or service awards until all material terms of the Settlement were negotiated and agreed upon. *Id.* There is no doubt that this Settlement is free of collusion, which further supports a finding that the Settlement should be granted final approval. *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to the absence of collusion."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) ("[A] class action settlement enjoys a 'presumption of correctness' where it is the product of arm's length negotiation conducted by experienced, capable counsel.").

## V.    THE NOTICE PLAN SATISFIED RULE 23 AND DUE PROCESS

The Notice Plan preliminarily approved by this Court was carried out according to the terms of the Court's order, Doc. 169 (adopting and confirming Judge Irick's Report and Recommendation, Doc. 166), and satisfied Rule 23 and due process. "Rule 23(e)(1)(B) requires the court to direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." Manual for Complex Litigation, Fourth, § 21.312. Reasonable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). In approving the Notice Plan in this case, the Court found that "the proposed manner of providing notice outlined in the Motion and Settlement Agreement is reasonably calculated to apprise the members of the action and settlement." Doc. 166 at 24.

The Settlement Administrator, JND Legal Administration, carried out the terms of Notice Plan that were approved by the Court. First, direct email notice was sent to 466,779 individual email addresses. Ex. C at ¶ 8. Pursuant to the terms of the Settlement Agreement, JND mailed the Postcard Notice via first-class regular U.S. mail to the 218,491 Settlement Class Members whose emails were returned as undeliverable or for which no email address was provided. *Id*. at ¶ 9. Of those, JND had updated 49,827 addresses using the U.S. Postal Service National Change of Address database. As of June 28, 2019, JND tracked 1,814 Postcard Notices from the original mailing that were returned as undeliverable with a forwarding address. JND promptly re-mailed Notice to those with USPS forwarding addresses. As of June 28, 2019, 9,250 Postcard Notices were returned to JND as undeliverable without a forwarding address. Those 9,250 undeliverable Postcards constitute less than 2% of the total Class Members. Such direct notice, by email and mail, is presumptively reasonable and satisfied Due Process. *See Weigner v. New York*, 852 F.2d 646, 650 (2d Cir. 1988) ("under most circumstances, notice sent by ordinary mail is deemed reasonably calculated to inform interested parties"); *United States v. Derenak*, 27 F. Supp. 2d 1300, 1305 (M.D. Fla. 1998); *see also Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1261 (S.D. Fla. 2016) ("In fact, email notice in class actions is becoming the preferred method of notification not only because it is reliable but it is actually more likely to be received by the Class members.")

Second, the Settlement Administrator established and maintained an informational, interactive website dedicated to the case to enable potential Settlement Class Members to find information about the litigation, file an online claim, and access downloadable copies of the Long-Form Notice, Claim Form, and other important court documents. Ex. C at ¶ 12 As of June 28, 2019, the Settlement Website tracked 24,547 unique users who registered 78,188 pageviews. Ex. C at ¶13.

Finally, the Settlement Administrator delivered the required Class Action Fairness Act notice to United States Attorney General and appropriate officials, pursuant to 28 U.S.C. §1715(b). Ex. C at ¶¶ 3-4.

Class Counsel have also assisted Settlement Class Members in understanding their options under the Settlement. Ex. B at ¶ 58. As the Notice lists Class Counsel's phone number, Class Counsel has received hundreds of calls and inquiries, and has hired additional part-time help in order to ensure that all Settlement Class Members who call receive a prompt response. *Id.* Class Counsel have continued to respond to such inquiries and to monitor and assist the claims process. *Id*.

Through the Notice Plan, Class Members received ample notice and have had the opportunity to exercise their rights; claims continue to be submitted to date, as the deadline for submitting claims is July 10, 2019. Accordingly, the notice that was executed was successful and complied with the Notice Plan approved by the Court, Rule 23, and due process.

## VI.    CONCLUSION

Plaintiffs' instant motion is unopposed. No Class Member has objected to the Settlement and the Notice Plan directed by the Court was successfully executed by the Settlement Administrator. Therefore, the reasons stated in the adopted and confirmed Report and Recommendation for certification of the Classes and approval of the settlement remain sound. Accordingly, for the additional reasons stated herein, and those stated in Plaintiffs' Unopposed Motion for Preliminary Approval (Doc. 162, 163) and Unopposed Motion for Fees, Costs, Expenses and Service Awards (Doc. 171), Plaintiffs respectfully request that the Court grant Final Approval of the Settlement, including finally certifying the Classes.

Dated: July 3, 2019                          */s/ Ed Normand*
                                             Edmund A. Normand
                                             FBN: 865590
                                             */s/ Alex Couch*
                                             Alex Ray Couch
                                             FBN: 118152
                                             NORMAND PLLC
                                             3165 McCrory Place, Ste. 175
                                             Orlando, FL 32803
                                             Tel: 407.603.6031
                                             ed@ednormand.com
                                             alex.couch@normandpllc.com
                                             service@normandpllc.com

                                             */s/ William C. Gray* (*pro hac vice*)
                                             William C. Gray, Esq.
                                             GRAY LLC
                                             17 N. State Street
                                             Suite 1600
                                             Chicago, IL 60602
                                             Tel: 312.967.3653
                                             BGray@GrayLLCLaw.com

                                             *Counsel for Plaintiffs*

**EXHIBIT LIST**

| Exhibit A | Joint Stipulation of Settlement and Release |
|-----------|---------------------------------------------|
| Exhibit B | Declaration of Edmund Normand |
| Exhibit C | JND Report and Notice Documents |
| Exhibit D | Declaration of Rodney Max |
| Exhibit E | Proposed Order |